Filed 4/13/21  P. v. Alvarez CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>EFREN ALVAREZ,<br><br>    Defendant and Appellant. | F078551<br><br>(Fresno Super. Ct. No. F16902732)<br><br><br>**OPINION** |

---

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan B. Conklin, Judge.

Law Office of Nico Capozzi and Nico Capozzi for Defendant and Appellant.

Xavier Becerra, Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, and Henry J. Valle, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Three individuals worked under defendant, a crew leader for a farm labor contractor, in March 2016.  Defendant paid the security deposit and first month's rent for an apartment, and thereafter a house, for them to live in with several others.  In exchange,

the victims agreed to work for defendant's crew through the end of the work "season." The victims gave up their visas as a condition of the loan.

The victims testified that defendant would berate them at work, threaten them with immigration consequences, and require them to work for him as a condition of their housing. Defendant was convicted of human trafficking as to one victim and extortion by means of force or threat as to all three victims.

Days before a defense expert on human trafficking was scheduled to testify at an Evidence Code section 402 hearing near the conclusion of trial, a billing and scheduling issue arose. The expert indicated he could not testify for several weeks. The trial court denied a defense request for a continuance and for a mistrial. Defendant claims on appeal that the judgment must be reversed because counsel rendered ineffective assistance with respect to the expert. We reject that claim and affirm.

## BACKGROUND

In a second amended information, the Fresno County District Attorney charged defendant and appellant Efren Alvarez with three counts of human trafficking (counts 1–3; Pen. Code, § 236.1, subd. (a))[1] and three counts of extortion (counts 4–6; §§ 518, 520) by means of force or threat (§ 519).

A jury convicted defendant on counts 2, 4, 5, and 6.[2] The jury acquitted defendant on count 3,[3] and deadlocked on count 1.

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

[2] The victim of counts 2 and 5 was Elena H.

[3] The victim of counts 3 and 6 was Luigi M., and the victim of counts 1 and 4 was Carmen B.

2.

The abstract of judgment reflects the court sentenced defendant to eight years in prison, comprised of the following:  the lower term of five years on count 2, plus one year each for counts 4, 5 and 6.[4]

**FACTS**

*Carmen B.'s Testimony*

In late 2015/early 2016, Carmen B.'s[5] daughter was set to begin attending a university in Mexico.  Carmen wanted to work in the United States to help pay for her daughter's tuition.  Another individual in Mexico, Elena H., told Carmen there was work available in "the fields" in Fresno.

Carmen arrived in the United States on January 9, 2016,[6] along with Elena and Elena's son-in-law, Alfonso C.  Initially they stayed at the apartment of a woman named Pilar.  Pilar, her husband and their four children lived in the two-bedroom, one-bathroom apartment.  Carmen and Elena slept on the floor in Pilar's daughter's room, and Alfonso slept in the living room.

Around January 13, three more workers moved into Pilar's house.  As a result, Pilar told Carmen, Elena and Alfonso they had to move out.  Defendant, a crew boss for a farm labor contractor, helped Carmen look for a place to live.  Defendant told Carmen, Elena, Alfonso and several other workers that he would find a place for them to live and pay for the deposit and "rent."[7]  In exchange for the loan, Carmen and the others would do paid work for him, beginning on March 3, while making weekly payments on the loan.

---

[4] In the oral pronouncement of judgment, the court referenced counts *three*, four and five, instead of four, five and six.

[5] According to the prosecutor, the victims asked to be identified by their first name and last initial in trial proceedings.

[6] All dates are in 2016 unless otherwise noted.

[7] While Carmen simply referred to "the rent," other testimony shows this was referring to the *first month*'s rent.

Defendant said he had work for them in the fields, and they would be paid $100 per day.[8] They would not have to begin repayment on the loan until they began working. Carmen willingly agreed to work for defendant as a term of their agreement. Carmen understood that she was obligated to work for defendant for the entire season as a term of the loan.

Defendant said that, in order for him to loan money to the group, they needed to give him something of value. Pilar suggested Carmen give defendant her visa to secure the loan. Carmen handed over her tourist visa but not her passport.

According to Carmen, defendant gave Pilar $1,360[9] two days later. Defendant said he would have a place for them to move to around January 20th.

Beginning January 15th or 16th, Carmen began working on defendant's crew, tying vines. During this initial stint, Carmen only worked for defendant for one week. While working for defendant, Carmen worked from 7:00 a.m. to 5:00 p.m. and was paid $30.[10] Defendant transported Elena, Alfonso, Pilar, Carmen, Pilar's husband and Pilar's son to work. Defendant deducted money from Carmen's pay for transportation. Carmen, Elena and Alfonso decided that they were not earning enough money, so Pilar contacted a man named Don Felix and they began working for him picking oranges. Carmen was still slated to work for defendant's crew beginning on March 3, pursuant to their agreement.

On or about January 20, Carmen, Elena, Alfonso and three others moved into the new apartment defendant had obtained. The group paid rent for the apartment directly to the property management company.

---

[8] Later, Carmen testified that when she started working, she only spoke with Pilar about how much she would be paid per hour.

[9] Later, Carmen testified that the total cost of the apartment was $1,360 but that defendant only loaned $1,000 of that amount.

[10] Carmen later testified defendant paid them $130 for the entire week.

Carmen asked defendant for her visa so she could visit her family in Tijuana on February 28. Defendant was concerned that Carmen would not repay her loan but relented and told Pilar to give Carmen back her visa for the trip. Defendant reminded Carmen that she was to begin work with his crew on March 3 and needed to be back by then. Defendant said that if she wanted to live in the apartment when she returned, she needed to continue working for him once she got back from Tijuana. Carmen went to Tijuana for four days. After that time, defendant said Carmen needed to return, which she did. Pilar told Carmen to return the visa, but Carmen never did.[11]

Around March 5, Carmen started working for defendant again. This time, Carmen's work was to "thin" pear, nectarine, and peach trees. Carmen initially testified that she worked nine to 10 hours every day, but later testified that her handwritten notes indicated she worked 41 hours on the week of March 19, 2016. Some days, it rained, and Carmen did not work at all.

Defendant stayed with Carmen and the others while they worked. Defendant would sometimes yell at them while they were working. Defendant would tell them they were "inept" and "good for nothing." One time, defendant pushed Carmen. If Carmen lowered one of her hands because it was cold, defendant would say he was going to "cut it off" or "cut our hands off."

When Elena would miss some flowers, defendant would send her back to the trees she had already worked on to remove the missed flowers. Carmen thought defendant's behavior was inappropriate because "sometimes it was simply one flower."

Carmen testified about the incident where a worker fell off a ladder. Defendant cleaned the worker's injury and told him to continue working. Defendant would not let the worker's mother approach to see how he was doing. The worker resumed working.

---

[11] As a result, Carmen had her visa and passport when she began working for defendant again in March.

5.

Defendant transported the group to and from work. Defendant told Carmen she either needed to accept his transportation to the work site or move out of the apartment. Defendant told Carmen that transportation would cost $8 per day. Carmen had no objection to having to pay to be transported to and from work.

Defendant paid Carmen weekly on Saturdays. Defendant said he was getting paid with a single check and would need to cash it to pay them. Defendant deducted $5 per week for cashing checks and $40 per week for "taxes." Carmen calculated that she should have been paid $550 per week, but she was only receiving $430 to $440 per week. After defendant paid the workers, he would ask for their payments on the loan. When they sometimes said they did not have the money, he would leave and return later.

Eventually Carmen and Elena's group moved to a five-bedroom house on Montecito Street. The house was nicer than the apartment where Carmen had previously been staying. The house was clean, and large enough that Carmen had her own bedroom. Defendant loaned the group $2,200 for rent and deposit for the Montecito house. Defendant also loaned them around $70 for the rental application fee, $270 for a refrigerator, and $150 for "trash." The ongoing monthly rent was $1,100, which Carmen and her housemates paid.

Carmen told Pilar she did not want to move to the house because she would have to pay more money. However, Carmen had no discussions with defendant regarding moving to the house. Carmen did not get her deposit back from the apartment on Hamilton.

Carmen testified she was never prevented from going anywhere in town. Carmen was not aware of anyone watching her or guarding the house where she was living. However, it did seem like every time she went to the store, she ran into Pilar. On one particular day, Elena, Luigi and Carmen went to the store, and defendant arrived thereafter and yelled at them to get in his vehicle. He then drove the group home.

6.

Carmen's husband encouraged her to return to Mexico. However, she did not return because, if she did, she would no longer be able to make money for her daughter's schooling. Also, defendant had threatened her regarding her immigration status.

One night, defendant came to the house drunk, looking for payment on the loan. He threw rocks at the door of the house. Carmen gave him the payment and the conversation ended. The next day, defendant said the group still owed more money. Carmen disputed that assertion.

Carmen "believe[s]" her group paid off their loan to defendant on March 20.[12] Once the loan was paid off, defendant told Carmen she was free to work somewhere else. Carmen felt free. However, defendant made clear that if she stopped working for defendant, she could no longer live in the house on Montecito. Defendant also stated he had copies of her visa.

Carmen wanted to visit Tijuana again, around March 27, but did not. Carmen testified the reason she did not go on this second trip to Tijuana was that defendant told her not to and said he had a copy of her visa.

On March 28, Carmen, Elena and Luigi had a discussion. They talked about how defendant was "pressuring" them. They could not sleep well because defendant was always yelling that they were "good for nothing." They also never had time to themselves, because defendant was always around. The group decided to "get help" so they called a field workers union. Carmen and Luigi met with individuals from the group they called and were eventually connected to the police. Carmen was concerned she would be sent back to Mexico. Carmen did not want to return to Mexico because she wanted to earn money for her daughter's schooling.

---

[12] Later, Carmen's testimony suggested the loan was paid off on the Saturday before she quit, which would have been March 26.

7.

Luigi quit and did not show up for work on March 29. When defendant came to the house to pick everyone up the next morning, he began yelling. Defendant told Carmen: "[D]on't think you are going to go to Tijuana, because I have a copy of your Visa. And if you go I'm going to turn you over to immigration."[13] Defendant claimed they were ungrateful after he had loaned them money for rent. Defendant said the group needed to convince Luigi to return to work or else they would have to work the entire season.

Carmen quit working for defendant, with her last day of work occurring on March 30.

*"Luigi" M.'s Testimony*

Luigi M. testified at trial.[14] While Luigi was in Mexico, Pilar told him that a foreman (defendant) would give him work and find him a place to live. Luigi came to Fresno from Tijuana on or about January 19, 2016. Luigi arrived by bus, alongside two other people: Gerardo and Israel. Luigi did not know other people in Fresno and did not speak English at the time.

Pilar told Luigi he could come to her house but did not say for how long.[15] Elena, Carmen and Alfonso arrived at Pilar's house sometime later.

The week after arriving, Luigi went to work for Don Felix earning about $80 per day.

---

[13] Carmen had been planning to go to Tijuana that Saturday.

[14] Luigi is this individual's second name, not first. We will refer to him as "Luigi," because it is the name most other witnesses used, and he indicated it was fine for trial counsel to refer to him that way. Luigi also acknowledged going by the pseudonym Luis Flores.

[15] Later, Luigi testified that he was told he was going to be at Pilar's house "a few days or a few weeks until [defendant] would find a place for us to live."

Luigi stayed at Pilar's place for approximately two weeks and paid no rent. When it was time for Luigi to move, he needed to rent an apartment. Luigi told Pilar he did not have any money to rent an apartment.

Luigi heard defendant and Pilar discussing that Luigi and others needed an apartment but had no money. Defendant said he would "give" them an apartment, but they had to work for him. Pilar and defendant said the only thing the workers had "of value" was their visa, passport, and "permit." Defendant said the visas and passports were of "no use" to him. However, they were the only things of value the workers had, so they decided Pilar would obtain the documents from the workers, so they would not be able to leave without paying. Luigi agreed and handed them to Pilar. Pilar said that once defendant had work for them in the future, they were to stop working for Don Felix and to begin working for defendant.

The deposit for the apartment was $650, one month's rent was $650, and the application fee was $70. The loan was being made to Luigi, Elena, Carmen, Juan, Emma and Christian. Gerardo and Israel were not on the loan "because they had money to pay for it all at once." Luigi's share of the loan required him to pay back $270 total. Luigi understood that after he paid back the loan, he would get his "documents" back.

Luigi, Carmen, Elena and others arrived at the new apartment, which was on Hamilton Street. The apartment was empty except for some bed sheets. Defendant did not ask Luigi if he needed anything else. One week later, people from Luigi's church gave them dishes, mattresses, a microwave, a table and chairs.

Luigi and his housemates gathered money for rent. Defendant used that money to obtain a money order since, according to Luigi, they did not know how to get a money order. Defendant was frustrated they could not figure out how to pay with the money order themselves.

Luigi began working for defendant during the first week of March. Luigi was still living at the Hamilton apartment at the time.

On the first day, defendant used obscenities while berating a coworker for setting up his ladder incorrectly. On another occasion, Carmen said her ladder was not working. Defendant responded that the "f[**]king ladder did work. That the one that wasn't working right was her." The next day, Luigi had to use that ladder, and he was scared. Defendant had a stick in his hand. Defendant said if the workers did not move both hands, he would cut them off. Defendant would always yell at them and say they were lazy and "not good for anything." Luigi "got brave" and grabbed a new ladder without permission. Defendant asked, "[W]hy did you change that f[**]king ladder?" Luigi said he had never disrespected defendant, so defendant should respect him. Luigi told defendant the ladder was not functioning. Defendant said, "[T]hat f[**]king ladder does work. The one that's not working right is you." Defendant then turned around and left.

On another occasion, a different ladder fell on Christian's head. Defendant told Christian's mother to leave and "get away." She said she would not leave because Christian is her son. Defendant did not see if he was injured and just told him to continue working. Christian continued working.

Defendant taught Luigi how to cut the flowers but offered "[v]ery little" instruction, saying it was "work for, like, children."

Luigi worked five days per week for defendant. Based on the pay he was receiving from defendant, Luigi calculated he was making $10 per hour. However, sometimes money was deducted from his pay for taxes, transportation and check cashing fees. Luigi "believe[s]" the transportation deduction was $8 per day. Neither Luigi nor his housemates were paid by check.

After Luigi had worked for defendant for two weeks, defendant said more people were coming in from Tijuana, and, therefore, Luigi and his housemates were going to move to a larger house on "Sierra Vista Montecito." Luigi was told that if he did not want to move, his group would have to break up so some could stay in the Hamilton

apartment while others moved.  Luigi and his group moved to the Montecito house. Luigi did not get a deposit back from the Hamilton apartment.

A week after moving to the Montecito house, Luigi paid defendant all he had initially owed.  Pilar gave him back his visa and other documents.

Luigi needed to get another loan to pay for the new housing.  Defendant "paid the rent,"[16] the deposit and the application fee for the Montecito house, and bought a refrigerator for the house.  Defendant "added [these amounts] to the debt."  However, Luigi did not give up his visa or other documents for this second "loan."  The only requirement for the second loan was that Luigi work for defendant through the entire season.

While living at the house, Luigi was never told that he was restricted in where he could go.  Luigi could go to church, the store, and anywhere else in town.  Luigi had a cell phone and could call whomever he wanted.  All of the other housemates, including Carmen, also had cell phones.

At some point, the Montecito house was "getting full" with cockroaches. Defendant posited that Luigi and his housemates were bringing the cockroaches in with their food.  Defendant made some reference joking that they were eating the cockroaches, and everyone laughed.

Someone from Luigi's church told him about a job opportunity.  Luigi had decided that once he paid off the second loan, it would be better to work anywhere else. However, Luigi was nervous because he was supposed to finish the season working for defendant.

Luigi paid off the second loan on March 28.  The day prior, Luigi called defendant and thanked him for the job, but said he had found work elsewhere.  Defendant hung up.

---

**16** While Luigi said defendant paid "the rent," other testimony shows Luigi meant that defendant paid the first month's rent.

11.

Two hours later, Pilar called Luigi. Pilar was angry and asked how it was possible Luigi had "left" defendant. Pilar pointed out that defendant gave him work, a place to live, and food. Pilar asked why Luigi was being ungrateful. Luigi responded that defendant had mistreated him.

The next day, defendant called Luigi. Defendant said Luigi "[was] f[**]ked," and that he was "going to throw immigration on you." Defendant said he had copies of Luigi's visa and passport. Defendant also said that when Luigi returned home, immigration would pick him up.

When Luigi returned home, his housemates told him that defendant had threatened to call immigration on them as well. Luigi and Carmen spoke with police officers.

Luigi never again worked for defendant. In total, Luigi had worked for defendant for one month, or possibly a "little bit under a month." Luigi later applied for and obtained a T-Visa.[17]

*Elena H.*

Elena H. was living in Tijuana in January 2016. Her husband was injured, and she needed to find work, so she decided to look for work in the United States. Pilar told her she a knew a man who could provide work in Fresno later in the year. Pilar also knew another man who could provide Elena work immediately. Pilar said Elena would be working eight to 10 hours per day, making $10 per hour.

Elena traveled to Fresno with her son-in-law Alfonso[18] and Carmen. Elena did not know anyone besides her two companions. She initially lived with Pilar.

Two or three days after arriving, defendant transported Elena and Alfonso to begin a job tying grape vines. Elena and Alfonso only received $30 per day. Elena had to pay

---

[17] According to the prosecution's expert, T-visas are a special type of visa for trafficking victims that include a work permit.

[18] Elena referred to Alfonso C. by the name "Juan."

for the transportation. Elena said she only worked enough to pay for the ride.[19] Three days later, Elena went to work on orange trees for a man named Don Felix.

After Elena had stayed there for two weeks, Pilar said too many people were living in her home, and that Elena needed to move out. Pilar told defendant to look for a place for them. Pilar told defendant to lend Elena money so she could find a place to live.[20] Defendant was hesitant to lend Elena money because he did not know her. However, Pilar vouched for Elena. Defendant said that because he did not know Elena, she needed to give him "something of value." Elena did not have anything of value. When Elena's visa was mentioned, defendant said the visa was of "no use to him." Pilar took the visas anyway. Defendant told Pilar to put the visas away, and gave Elena $1,000 for rent and a security deposit in exchange for her agreement to work for him for the rest of the "season," which spanned from March to October.[21] Elena agreed to work for defendant because he was the person Pilar had told her about in Tijuana. Elena gave her passport and travel visa to Pilar, who put them "away."

Elena moved into a two-bedroom apartment, which had no furniture. Including Elena, seven people lived in the apartment. Defendant loaned Elena additional funds to purchase a refrigerator. Elena was still working for Don Felix at the time, and her work for defendant was not set to begin until March.

As agreed, Elena began working for defendant in March. Defendant told Elena she would make $10 per hour and would work nine to 10 hours per day. Defendant paid Elena in cash on Saturdays. He deducted $8 per day in transportation costs, $40 for taxes and $4 to $6 in check cashing fees from Elena's pay. Elena never told defendant not to

---

[19] Carmen testified that this first time they briefly worked for defendant, they were paid less than they were once they began working for him again in March.

[20] Alfonso testified that the loan was made to Elena, himself, and "everyone" who was moving to the apartment.

[21] Defendant loaned additional amounts a later date.

cash her checks. However, Elena had not seen any checks until a police officer later showed her the last one that she had earned. Other workers were paid by check.

Elena later told law enforcement that defendant paid her the full amount she earned, less taxes, $5 for check cashing fees, and $8 for transportation. After working for defendant for around two weeks, Elena began making payments to him for the loan.

Defendant was a demanding boss and would yell at Elena. He told Elena she did not know how to work and therefore needed to emulate a coworker. Elena felt "humiliated" because she believed "nobody should compare you with someone else." Defendant also suggested Elena and two coworkers should be ashamed for falling behind in their work compared to another group. When a coworker named Christian was cut by a falling ladder, defendant did not help him. Defendant told the workers that they needed to work with both hands, and that if they only worked with half of their hands, they would get half of a paycheck. Elena did not remember defendant saying anything else that caused her to be concerned for her safety.

One time, defendant joked that Elena and others were eating cockroaches for lunch.

At one point, defendant told Elena that she had to move again, this time to a five-bedroom house. In the house, Elena had her own bedroom. Defendant lent more money to Elena for the house. The rent for the apartment had been $650 per month, but the rent for the house was $1,100 per month. Elena would have been comfortable staying in the apartment because it was cheaper.

At some point, Elena paid off the loan to defendant.[22] Pilar gave Elena her visa back the next day. However, Pilar said Elena had not given her a passport. Elena pointed

---

[22] However, defendant believed two other people, Gerardo and Israel, still owed money.

14.

out that she had given Pilar her passport. Pilar said she would check in another place she might have placed it. However, Elena never received her passport back.

Because the loan had been paid off, Elena asked if she could now visit her family in Tijuana. Defendant asked, "[W]ho was going to stay as responsible party for the house that had been rented?"

Two days after Elena received her visa back, defendant was transporting Elena and other workers to the job site. Defendant became upset that Luigi had quit. Defendant yelled at Luigi over the phone, asking why he had left defendant "with the work." Defendant turned to Elena and other workers, and said, "[T]his goes for you too," and threatened to report them to "immigration." Elena was concerned because she knew her visa did not allow her to work in the United States. Defendant told Elena and others that Luigi should move out of the home because it was for his workers only.

Later that day, Elena asked if she could visit her family in Tijuana, and defendant said yes. However, defendant changed his mind because someone needed to "stay with the responsibility of the" the Montecito house. On cross-examination, counsel asked whether defendant had, in fact, simply asked her to sign up for a particular time to leave because he could not have everyone leaving at the same time. Counsel asked whether defendant asked for people to sign up to "take turns" going to Tijuana, Elena testified: "I don't remember honestly. All I remember was that when I needed to go I couldn't go." Elena continued, "I wasn't able to go anymore because [defendant] said how that *all of us wanted to go* … [a]nd who was … going to stay and be responsible for the house *if we all left*?" (Italics added.) Defendant also was not sure they would return to work.

The next day, defendant came to the house where Elena was staying, looking for Luigi and yelling. Elena and her housemates told defendant Luigi was not there. Defendant threw a rock at the door of the home. Elena stopped working for defendant that day.

15.

After speaking with law enforcement officers, Elena applied for and was granted a T-Visa, which required her to stay in the United States.

*Alfonso C.'s Testimony*

Elena's son-in-law, Alfonso C., testified about defendant's loan, which was to be used for housing. Alfonso said he was not required to give defendant anything for the loan. Alfonso had a passport but did not give it to defendant. Defendant had paid Alfonso in cash, after deducting taxes and transportation costs.

*Manuel Manzo's Testimony*

Manuel Manzo worked for defendant's crew along with Carmen, Elena and Luigi. Manuel testified that when they arrived at the field, defendant "would show us how to set up the ladder, how we would thin the flowers …." Manuel also recalled getting 10-minute breaks.

Sometimes, Carmen, Elena and Luigi would invite Manuel to eat with them, and he would. When Manuel was asked to describe the interactions between defendant and Carmen, Luigi and Elena, he said they were "very good," and that defendant "would always show them the right way." If they fell behind defendant would say, "[H]ey … get into the work. Keep a good attitude." Defendant spoke to them with respect.

Manuel no longer worked for defendant at the time of his testimony. Manuel traveled with defendant to court to testify.

*Pablo Gonzales*

Pablo Gonzales also worked on defendant's crew thinning pear trees in March 2016. Pablo recalled Carmen, Elena and Luigi working as part of the crew, but he did not personally interact with them. When asked how defendant treated his workers, Pablo said "normal," "[f]ine" and "good." Defendant would pair the "new guys" with people who were more experienced. Defendant would give them a "class before we would go to work [on] how you use the tools of your job." When Carmen, Elena and Luigi were shown how to do the work, "they were fine."

Defendant rode in the same transport vehicle as Carmen, Elena and Luigi. The vehicle normally had 10 or 11 people in it. Defendant charged Pablo $8 per day for the transportation.

*Francisco Alfaro*

Francisco Alfaro, a distant cousin of defendant's, also worked on defendant's crew in March 2016, alongside Elena and Carmen. Francisco was paired with Elena and told her how to do the work.

Defendant's treatment of Carmen and Elena was "[v]ery good." Defendant told them how to do the work and spoke "nicely."

*Micales Gomez*

Micales Gomez also worked for defendant thinning pear trees in March 2016. However, Micales did not get to know Carmen, Elena or Luigi.

When Micales began her work, defendant gave a "class on how we have to work." The workers would be paired together, so one could explain to another "how to do things." Defendant would supervise the work and was always watching. If he saw someone was not doing the work correctly, he would "right away" explain how to do the work.

Defendant's daughter transported Micales to court.

*Martin Alcantar*

Defendant's cousin, Martin Alcantar, also worked for defendant's crew in March 2016. Martin did not remember Carmen, Elena or Luigi.

Defendant gave workers a "little training and then he'd check to see what we were doing." Defendant treated everyone well.

*Detective Demencio Longoria*

Detective Demencio Longoria with the Fresno Police Department testified at trial. On March 31, Longoria was informed that two individuals had come into the United

Farm Workers (UFW) office in downtown Fresno asking for help. The individuals were very apprehensive about speaking to law enforcement.

Eventually, Detective Longoria was able to speak to the two individuals – Carmen and Luigi. Carmen and Luigi gave Longoria an "overview" of the situation. Thereafter, Carmen and Luigi were split into separate interview rooms. Longoria remained with Carmen, while Luigi was interviewed by an FBI agent.

Carmen told Detective Longoria she had arrived in Fresno on January 11, 2016, with the intent to work. After describing her situation, Carmen said that there were three other people "in her similar situation that were at the house on Montecito." Carmen also provided defendant's first name and phone number.

Detective Longoria went to the Montecito house to perform a welfare check on the other individuals. By this time, it was after midnight. Elena, Christian and Emma were at the house. They said they wanted to leave. The victim advocate from the Equal Opportunity Commission (EOC) had a motel room for them to stay in, so they quickly collected their belongings. Longoria noticed there were cockroaches all over the kitchen.

The next week, Detective Longoria spoke with Elena. She provided information consistent with what Carmen had told him. Emma and Christian were interviewed by other detectives, and shortly thereafter traveled back to Mexico.

Detective Longoria contacted the owner of the Hamilton apartment, who provided a lease agreement in the name of defendant and his live-in girlfriend, Rose Navarette. Navarette was also listed on the lease agreement for the Montecito house.

Law enforcement simultaneously executed search warrants on defendant's own residence on East Butler Street, and Pilar's residence on South Winery. Detective Longoria was present for the search of defendant's residence, along with Detective David Fries and Sergeant Curtis Chastain. In a spare bedroom, Fries located identifications

belonging to people other than defendant.[23]  In the living room, Fries located a log with names and numbers.  In a white Toyota pickup on the premises, officers located paystubs, a small notepad with names and pay amounts, and a photocopy of an identification of someone other than defendant.  The paystubs were for Carmen, Elena and Luigi.

Muhammad Alamari told Detective Longoria that defendant would come to cash three or four checks in other peoples' names.  Alamari allowed defendant to cash other peoples' checks because he trusted him.

Detective Longoria interrogated defendant on April 18.  Defendant said he met "them" – apparently referring to housemates Luigi, Elena, Carmen, Emma and Christian – at Pilar's house.  They told defendant they needed work, so he offered them a job.  They began working for him on March 5.  Defendant said he cashed their paychecks on their behalf and gave them the cash.  Defendant said he charged them $5 per check for cashing fees, and $5 to $6 per day for transportation.  Defendant denied mistreating the individuals who worked for him.  However, defendant said he was upset with Luigi for quitting without notice.

Defendant said he found them a place to stay at the Hamilton apartment.  Defendant said he did not loan them the money, but instead paid for the deposit and first month's rent directly for the apartment and thereafter for the house.  Initially, Detective Longoria testified that defendant said he expected them to pay him back.  Thereafter, Longoria testified that defendant said he did not charge them for the apartment.

Detective Longoria asked defendant about obtaining the visas and passports in exchange for the loan.  Defendant said he did not want the visas and was not the one who asked for them.  Defendant said he knew Pilar had the visas but initially claimed to not know why.  Later, he said Pilar held the visas for the group because Pilar was nervous

---

[23] Detective Longoria testified that the people to whom the identifications belonged knew defendant had them and gave him permission to possess them.

defendant would hold her responsible for the loan if the group failed to pay it back. Later still, defendant said the group wanted Pilar to hold the visas for them. Longoria believed these constitute "three different stories," and suggested defendant was lying.

Defendant told Detective Longoria he liked to help people, but they often did not appreciate it. Defendant referenced the fact that he cannot force people to work.

*Execution of Search Warrant at Pilar's Residence*

Detectives Sylvia Anaya-Tucker and Linda Anaya participated in the execution of the warrant on Pilar's residence.[24] Tucker looked in Pilar's purse for identification and found a plastic bag with several passports.[25] Pilar said they belonged to friends of hers.

Detective Anaya delivered the documents to their owners, who were residing at the Hamilton apartment. The names of the individuals matched names in the notebook found in defendant's vehicle.

*Lorenzo Perez*

Lorenzo Perez testified that he was looking for housing, and a friend referred him to Elena. Lorenzo rented a room in the house Elena was staying in for $350. Lorenzo negotiated with Elena directly for the terms of his rental. Lorenzo observed that all three of the residents had cell phones. Three days after Lorenzo moved in, Elena and the other residents "took off" in the early morning.

On cross-examination, Lorenzo testified that he had known defendant for several years and was going to begin working for him on Saturdays. Defendant told him there was a room available at the house.

After Elena and the other residents left, Lorenzo found additional renters. The additional renters did not work for defendant.

---

[24] We will refer to Detective Sylvia Anaya-Tucker as "Tucker" and Detective Linda Anaya as "Anaya" to avoid confusion.

[25] Detective Tucker testified she "believe[s]" that other documents like visas and permits were in the bag as well.

*Prosecution Expert Stephanie Richard*

Stephanie Richard testified as an expert for the prosecution.[26] Richard works as the policy and legal services director for the Coalition to Abolish Slavery and Trafficking. Richard testified that she has had "clients" who have not lived with their "trafficker" and have had cell phones, yet were still tied to their trafficker through an "invisible bond[]." She also testified that "labor trafficking … can be for a very short period of time." Forced labor can occur even without physical violence or restraint but could instead involve coercion. Traffickers sometime take advantage of a victim's immigration status. Often, victims of labor trafficking do not ask for help.

Richard testified that under "the California statute … if you take someone's documents, if that's what keeps them working even for one day, then you have labor trafficking." Alternatively, "if someone takes on a debt … and they feel like they have to work at a specific job to pay back that debt, that can be labor trafficking."

The prosecutor presented Richard with a hypothetical similar to the facts of the present case and asked if it was consistent with human trafficking. She testified that, under the circumstances described, if the victim worked one day or more because of threats to report the person to immigration, then it would meet the legal definition of labor trafficking.

Richard said an individual can voluntarily agree to put up their Visa as collateral for a loan. However, it is illegal for an employer to *take* an employee's immigration documents. Even where the individual voluntarily agrees to put up their visa as collateral

---

[26] "In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding the effects of human trafficking on human trafficking victims, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of human trafficking victims." (Evid. Code, § 1107.5, subd. (a).)

for a loan, that circumstance could create a "pressure[d]" environment to keep working for that specific employer.

Richard said it is common for employers to provide employees transportation to and from work and to deduct money for the service.

*Prosecution Expert Dr. Susie Baldwin*

Dr. Susie Baldwin testified as an expert for the prosecution. Dr. Baldwin, a medical doctor, is president of the board of H.E.A.L. Trafficking.[27] Dr. Baldwin was not familiar with the facts of the case and testified generally about coercion and trauma.

*Defense Expert Dr. Andrew Alvarado*

Dr. Andrew Alvarado testified as an expert on behalf of the defense.[28] Dr. Alvarado testified that over the last 20 to 25 years, there has been a "dramatic shift in who hires … farm workers." The vast majority of farm workers are employed by farm labor contractors, rather than the farm owner-operator. The farm labor contractor then hires individuals to supervise, transport, evaluate and dismiss the farm workers. The extent of supervisory personnel and structure depends on the size of the farm labor contractor.

The "bottom" rung of the supervisory hierarchy is a "crew leader." Regardless of size, a farm labor contractor will at least have a crew leader. Crew leaders work directly with the crews performing the farm labor. The crew leader is with the farm workers "constantly" rather than merely periodically. They are responsible for addressing any worker performance that is "below standard." Crew leaders are "very frequently involved in the hiring of the workers and in transporting the workers, and in some cases providing housing …."

---

[27] The acronym stands for Health, Education, Advocacy and Linkage.

[28] Dr. Alvarado did not review police reports or transcripts concerning this case.

Dr. Alvarado's own study[29] of farm workers indicated that farm workers' pay is not set by the crew leader, but instead by the farm labor contractor.

*Jury Instructions*

The court's jury instructions on human trafficking are reproduced, in part, below:

"The defendant is charged in Counts One, Two, and Three, with human trafficking in violation of the law. To prove the defendant guilty of these crimes the People must prove one, the defendant either deprived another person of personal liberty or violated another person's personal liberty; and two, when the defendant acted, he intended to obtain forced labor[] services.

"Depriving or violating another person's personal liberty as used here includes substantial and sustained restriction of another person's liberty accomplished through force, fear, fraud, deceit, coercion, duress, menace, and is under circumstances in which the person receiving or perceiving the threat reasonably believes that it is likely the person making the threat would carry it out.

"Forced labor or services as used here means labor or services that are performed or provided by a person and are obtained or maintained through force, fraud, duress or coercion or equivalent conduct that would reasonable overbear the will of the person.

"Duress means a direct or implied threat of force, violence, danger, hardship or retribution that is enough to cause a reasonable person to do or submit to do something that he or she would not otherwise submit to do.

"Duress also includes a direct or implied threat to destroy, conceal, remove, confiscate or possess any actual or purported passport or immigration document of the other person or knowingly destroying, concealing, removing, confiscating or possessing any actual or purported passport or immigration document of the other person."

## DISCUSSION

## I. Defendant has Failed to Establish Deficient Performance of Counsel

Defendant claims his counsel acted in a constitutionally deficient manner with respect to obtaining expert testimony at trial.

---

[29] Dr. Alvarado's most recent study was performed in 2001 or 2002.

### A. *Additional Background*

An off-the-record discussion occurred on the morning of August 28, 2018, near the end of trial. The court described the prior discussion as follows:

> "[A]s I understand what [defense counsel has] told me so far this morning, and I'm going to put that on the record now, that though this [expert] witness was scheduled to appear today for an offer of proof regarding the foundation for his testimony, he communicated with your office – and though he had agreed to come previously, he changed his requested reimbursement rate. And also told you that … the soonest he could be available for this trial is approximately four weeks."[30]

The court further noted that an Evidence Code section 402 hearing was scheduled for the expert that morning (i.e, August 28, 2018.)

The court asked defense counsel when he had informed the expert that he needed to be in Fresno today. Counsel responded, "That was on the 10th of August. I sent our retainer for him and also let him know that we had given the court a ten-day estimate for our trial. And that we'd start calling witnesses August the 20th, 2018."

Defense counsel conveyed his understanding that the expert would not be available to testify for at least three to four weeks. The court said it would send the jury home until the next morning and give defense counsel an opportunity to let his expert know he "needs to be here either tomorrow or Thursday at the latest." If the expert agreed, then "problem solved." "If not, then we'll proceed to the next step."

The court had a murder trial set to begin as soon as defendant's case was over. That trial would take until the end of October to complete. The prosecutor had another jury trial scheduled in October, which she believed was scheduled for the "end of October." As a result, the court concluded the earliest the jury could be called back would be the week of November 5th.

---

[30] Defense counsel clarified the expert said "several weeks."

The court was concerned about delaying the trial substantially because the court would have to explain to the jury there was a "problem with a witness." The court would then ask if the jury could return in, say, four weeks. There was the possibility the jury would say "no," they are not available. In that scenario, the jury would be aware that there was a "critical witness out there who will not be testifying. And the damage is done. Because they are going to speculate as to who would call the witness and what would happen. And that would practically force mistrial." The court said it did not "want to go there."

The court stated that its tentative ruling was that "unless [the defense expert] witness can be here tomorrow or the next day, we're going to proceed to closing argument and instructions tomorrow morning."

The court called in the jury and told them they were to come back tomorrow morning. The court told the jury that it anticipated they would hear instructions and argument tomorrow and potentially one more witness.

After the jury left, the court told counsel they would return that afternoon to discuss how to proceed.

In the afternoon session, defense counsel said he called the expert three times, including a cell phone number and an office number. Defense counsel's paralegal called him twice and sent text messages. Defense counsel had not received a response from the expert.

The court said that if the witness became available by tomorrow, he could testify. The court then asked defense counsel what he was requesting if the expert was not available. Defense counsel requested a continuance of trial to a time agreed upon by the jury to accommodate the expert. If the court denied that request, the defense wanted a mistrial. He argued that "proceed[ing] without an expert is highly prejudicial to my client because of the nature of the offenses where the law[']s in [a] state [of flux.] And if

25.

the experts are the ones that are keeping more up with the changes and what the new definitions of duress and coercion and – what the definition of these offenses are."

The court asked for an offer of proof or an explanation of what the expert would address. Counsel said the expert "would address whether our review of the police reports and the preliminary hearing transcript – whether, in fact,… there [were] activities that amounted to human trafficking or not or whether there were other kinds of actions that were involved here."

The prosecutor objected to a continuance "[b]ecause it would prejudice the People's case in that the jurors would be distanced from the testimony that they are about to consider." The prosecutor also objected to a mistrial because it was "speculative" whether the expert will even "be retained."[31] The prosecutor also noted it was unknown whether the witness would even qualify as an expert. The prosecutor said defense counsel's offer of proof suggests the expert's testimony would be "in violation of *People v. Sanchez*." (See *People v. Sanchez* (2016) 63 Cal.4th 665.)

The court denied the request for a continuance because it was uncertain whether the expert would testify and when. It was uncertain whether the defense could lay a proper foundation for the witness' testimony. Moreover, the court observed that a four-week delay would prejudice the prosecution because it was "simply not reasonable" to ask the jurors to remember four weeks back about important criteria such as the demeanor of witnesses.

The court also denied the request for a mistrial "for the same reasons." The court observed that due to the "ambiguities" surrounding whether the defense could lay a proper foundation for the expert meant that "we could easily end up at the same place" if a new trial was held. The court "recognize[d]" defendant's due process right to a fair

---

[31] Presumably, this is a reference to the possibility that the expert and defense counsel would be unable to resolve the fee dispute.

26.

trial and to have an effective defense, and felt it was "honoring" those considerations because "the most effective trial he can get is the trial that we're in." The court also reiterated its concern that once the jury was asked if it could return later to accommodate a witness, it would then know that there was a witness who had not testified.

The next day, the court proceeded to give the jury instructions, followed by closing argument by counsel.

## B.    *Law*

"A criminal defendant's federal and state constitutional rights to counsel (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15) include the right to *effective* legal assistance. When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding. [Citations.]" (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

When a defendant's claim of ineffective assistance of counsel requires investigation of evidence outside the record, it can only be addressed in a habeas corpus proceeding. (See *People v. Williams* (2013) 56 Cal.4th 630, 691.)

## C.   *Analysis*

Defendant argues his counsel was ineffective because he gave the expert a 10-day window in which he would be called to testify, and date of the Evidence Code section 402 hearing fell outside of that 10-day window.  Specifically, he argues that, with trial scheduled for August 13, 2018, "the expert was under [the] belief he could be called no later than August 23, 2018."  Therefore, "the specific time of the [Evidence Code section] 402 hearing, which was set five days after the [10-]day window, was never communicated to the expert."

Defendant is factually incorrect in an important respect.  Counsel said he gave the expert a 10-day window beginning *August 20th* – i.e., the date the *defense* expected to begin calling witnesses (not August 13, the date the trial began).  While some parts of the discussion were confusing, the court clearly asked, "[Y]ou then told your expert on approximately August 10th that the trial was starting on August 20th and would be approximately ten days of testimony which would give us the closing date of the 31st of August?"  Defense counsel replied, "That's correct."[32]  Therefore, the date of the scheduled Evidence Code section 402 hearing – August 28 – *did* fall within the 10-day window counsel had communicated to the expert.

Defendant further faults counsel because his last contact with the expert was on August 10, 2018, which was 18 days before the scheduled Evidence Code section 402 hearing.  But the court observed that defense counsel was "in touch with [the expert] witness this most immediate Friday the 24th of August …."  That is when the witness said he was unavailable to testify.  We cannot say counsel is constitutionally deficient when he puts an expert on notice of being called during a 10-day window, and then

---

**32** When the prosecutor noted that trial began on August 13, defense counsel said: "What I'm saying, Your Honor, when *I* will start calling witnesses, so I gave the [P]eople the 13th that week."  (Italics added.)

communicates with the witness four days before being scheduled to testify during that 10-day window.[33]

Defendant also argues that counsel is "expected to get the billing arrangements worked out ahead of time." However, defendant has failed to show that counsel was deficient in this regard. The court recounted the off-the-record discussion as follows: "[T]hough [the expert] had *agreed* to come previously, he *changed* his requested reimbursement rate."[34] (Italics added) In other words, it appears defense counsel *did* get the billing arrangements worked out ahead of time, only to have the expert try to change the arrangements last minute. Therefore, defendant has not established deficient performance.

Because defendant has not established deficient performance, we do not reach the issue of prejudice.

## DISPOSITION

The judgment is affirmed.

---

[33] Defendant contends counsel did not seek an additional expert. However, the defense did have one expert testify at trial: Dr. Alvarado. Presumably, defendant is arguing that defense counsel did not try to get another expert to testify instead of the second, unavailable expert. But defendant provides no record citation for this assertion. Nor does it appear defense counsel could have obtained a witness who could testify in the existing expert's stead given that he only learned of the problem a few work days before the scheduled Evidence Code section 402 hearing, and the court denied the request for a continuance of trial.

[34] Granted, this is defense counsel's version of events. However, to the extent defendant would seek to disprove counsel's assertions with evidence outside the record, that cannot be done on direct appeal. (See *People v. Arce* (2014) 226 Cal.App.4th 924, 930.)

                                                    POOCHIGIAN, Acting P.J.

WE CONCUR:


DETJEN, J.


PEÑA, J.